This case is In Re National Football League Players Concussion Injury Litigation, case number 23-15-85. We'll hear from counsel for appellants first. Please let us know how much, if any time, you'd like to reserve for rebuttals. Good morning, your honors. Good morning. May it please the court. David Campbell here for appellants, Yvonne Sagapolitelli, and the many other family members of deceased NFL players. Your honor, I'd like to reserve five minutes for rebuttal. In my brief time before the court today, I thought it might be most helpful to focus on two issues from the briefing. One arising strictly from the settlement agreement, and then two, due process. For the settlement agreement, I thought it would be helpful to focus on the text and context of the agreement, because the text of the settlement agreement includes no brain examination requirement. Particularly in a case that is in the context of a class action settlement, where the settlement agreement is going to be interpreted by ordinary people, absent class members who aren't represented by counsel, such a requirement must be explicit and clear in the settlement agreement. In this case, it is simply not there. And then due process. On due process, because this is a class action, there is, of course, a requirement recognized since 1940 by the Supreme Court in the Hansberry case, and recognized numerous times by this court, that class members receive adequate, meaningful notice. And that's particularly true, again, with this type of requirement. Remember that in this case, we're talking about family members who lost a loved one, who was dead at the time that this settlement agreement was approved. And so- Can I ask you- Yes, Judge. I had understood your brief to assert a sort of due process avoidance interpretation. I didn't- Is the actual due process question in front of us? It is for this issue, Your Honor. And I do think that it does go hand in hand. I think in our brief, we did brief it more as informing the way that the court interprets the settlement agreement. And I think that's certainly appropriate. I think the reason that in thinking about it and preparing for argument, I've separated them out, is that I think that the court could put aside the due process argument and just look at the plain text of the settlement agreement, employing normal contract interpretation principles, and on that basis alone, reach the right result in this case. However, as we mentioned in our brief, there might be a sort of a constitutional avoidance issue where if there was any doubt, if there was some question about whether or not that was hiding somewhere in the settlement, that brain examination requirement was somewhere in there, then I think that the due process concerns would kick in and affect the type of review that this court applied. And so, yes, I think they work hand in hand. I don't think that the court has to necessarily view them together. You could write this opinion simply based on the settlement agreement without ever mentioning due process. So let's just talk about that settlement agreement. It strikes me that, you know, you talk text and context, and we get to, if we're going to isolate kind of the most important part, it strikes me that it's the phrase, post-mortem diagnosis of CTE made by a board certified neuropathologist. You think I've got that right? You think when we're looking for the most important part, that's the most important part? Absolutely. Yeah. And so there's some context. There's a debate between the parties. It's kind of weird because both parties think it's clear. Both parties say, this is what post-mortem means. No, it means something different. I'm sure that it means this. So kind of an interesting point. And then diagnosis, there's some disagreement, but I want to pick up on the phrase by a board certified neuropathologist. If it would have said by a radiologist, we would expect them, we would expect, I think it's a natural implication to say radiologists examine images. You know, maybe it's an x-ray, maybe it's something like this. It would be very weird to say the radiologist made a diagnosis based on some other test, maybe it's an EKG or a blood count or something else that radiologists typically don't use. It's just natural to say when you designate someone as a field of specialty that I think it's, isn't it fair to imply that they would use the tools of their specialty and then neuropathology is all about tissue exam, cell and tissue exam under a microscope. So it strikes me that doesn't that phrase kind of begin to color the construction of the other two terms even if they are ambiguous to mean like, gosh, it would be weird to ask a neuropathologist to do this if they were going to do something other than what's the tool of their trade, cell and tissue exam under a microscope. What do you think? So Judge Phipps, I think, let me give you a couple of thoughts on that. First as we pointed out on a brief, obviously neuropathologists do have a specialty, but that doesn't mean that that is a tool they have to apply all the time. So I think let's start there. Second, I think it is not surprising that the settlement agreement would include a board certified neuropathologist for a couple of reasons. There aren't many board certified neuropathologists in the United States. I think it's closer, I think it's more than 10, but I think it's maybe under 100. I mean there are not many. And so given the fact that CTE was discovered by a neuropathologist, it's a fairly recent disease, just discovered in 2002 down the way in Pittsburgh. It makes sense that that is the type of person who is going to know the most about this type of disease, however they diagnose it. But they diagnosed it using cell and tissue exam, so I mean you understand that that kind that comes with my understanding of the diagnostic process for CTE is cell and tissue exam. So Judge Phipps, that was going to be my last point. If we wanted to know, I mean frankly when I read the settlement agreement, I had no idea what a neuropathologist did. And I think when we put ourselves in the shoes of ordinary people reading the settlement agreement, they would read that to mean I need some fancy doctor to perform a diagnosis. If we want to know the scope of how neuropathologists diagnose in the realm of cases, I was just going to say that the best person to ask would be a neuropathologist. And I think it's undisputed in this case, and I'm willing to concede, that the only way to 100% conclusively, definitively diagnose CTE would be to cut open a brain and look for the top proteins. However, in this case, what Dr. Hamilton explained is that one of the most diagnostically significant facts that you could have if you want to know if someone has CTE is whether that person played NFL football. Because we know now that over 99% of the brains that have been examined of NFL football players have demonstrated that they have CTE. And so I can't see how that would be insignificant to a board-certified neuropathologist, even if their preference might be to get to 100%. It certainly does not discredit their diagnosis if they can only get to a more than 99% probability. One of the themes, and I don't know where it treads exactly, if it treads in the ambiguity space or in the due process space, is almost a plea to use a canon of construction like a least sophisticated consumer sort of standard that comes in the Fair Debt Collection Practices Act instead of just the clear words of the agreement. And so it almost feels like we're sitting there saying it has to be written for the least sophisticated consumer, not just the clarity that you would say, hey, everyone within the drafting community of lawyers understood it to mean. Because if we begin to look at the data from the drafting community of lawyers and what their projections were, it seems that everyone kind of at the time had an understanding that this involved a tissue exam after death. Now, if we say, oh, no, we're going to import a least sophisticated consumer understanding, that's a different thing. But it seems that that might be implicit in your argument. But really, you're asking for that, aren't you? Some lower standard of contract construction. So Judge Phipps, let me say two things in response to that. I am asking for that. Now, I don't think the court has to do that. I think that you can just apply normal de novo review, just as a matter of law, contract construction. But I do think that it makes sense in the context of a class action, in the same way that it would make sense in maybe a consumer. The thought that I had had, I don't know if I put this in my brief, was in many states for insurance policies, when you're interpreting an insurance policy, if there's any reasonable interpretation that supports the policyholder's position, there's coverage. So I mean, there are canons like this. I looked at this court's precedent and others' precedents to see if I could find any court wrestling with that question of what type of standard would apply. I wasn't able... Isn't that the purpose of the long and short form notices, to put them in plain language? And that was going to be my second point, which was, if you move on from that point of what standard applies, even if you disagreed with me on that, then I think the due process argument really kicks in with some force. And that's where, if you look at the long and short form notices, it's undisputed that before the opt-out deadline, there was no mention of a tissue examination requirement. Just in the last 30 seconds that I have before I need to sit down, unless there are other questions, I also wanted to point out, Judge Phipps, that in addition to the fact that there is nothing before the opt-out deadline, if you look at my friend on the other side's brief, everything they point to, with the exception of objections, comes after the opt-out deadline. And if you go drill down, there's just one side to, I think, 60 pages of objections, and looking through those objections, I didn't see anything of those objections that would tell me that it was universally understood that there was a brain tissue examination requirement. As far as, again, what is before us, some of your briefing references the insertion of a timing of diagnosis, but I don't think that is squarely before us, is it? That's correct, Judge Chong. If I could just briefly expand on that. That is an argument that we raised for actually 20 clients. If you look at the judge's order, you'll notice that she remanded two cases back to the claims process. For those two cases, the only issue was our argument about the deadline. And so, we did ask the judge to make it clear in her order whether or not she was reaching that issue, because it appeared that for these individuals, she wasn't reaching the issue. So we're just asking the court to remand, so that we can allow the district court to clarify that. Thank you. We'll hear from Your Honor rebuttal. Thank you. Thank you, Your Honors. Kenneth Chambegin of Paul Weiss for the NFL Appellees. May it please the Court. There was no ambiguity in the relevant provisions of the NFL Concussion Settlement Agreement. In order to recover for death with CTE, a claimant was required to come forward with a postmortem diagnosis by a certified pathologist. That is, a diagnosis through a postmortem pathological examination of the decedent's brain tissue. That is how the relevant provision of the settlement agreement was universally understood at the time, and for good reason. When you say universally, who is that? So we point to statements by counsel on both sides. We point to statements in Judge Brody's opinion and this Court's opinion approving the settlement agreement. And to be sure, as my friend Mr. Campbell says, those statements were made after the opt-out deadline, but we really rely on them as evidence of the plain meaning of the terms in the settlement agreement, and as confirmatory of that plain meaning. At the end of the day, we recognize that this is a question concerning the construction of the relevant provision of the settlement agreement, the provision that Judge Phipps quoted at the outset. And I think that the key terms in the settlement agreement are all mutually reinforcing, and I want to say just a little bit about each of those terms. Now to begin with, the settlement requires a postmortem diagnosis. Now appellant's contention, as I understand it, is that postmortem here simply means after death, but that cannot be correct. And the reason why is that we're talking about a diagnosis of death with CTE. That can only take place after death, and so an interpretation that defined postmortem as simply meaning after death would render that term really redundant. Instead, we think that the correct understanding here is that postmortem is a noun being used as an adjective. When we talk about a postmortem, what we're talking about is an after-the-fact examination in the medical context. Typically, a postmortem is an autopsy. Here we're talking about brain tissue, and therefore, we believe that that mandates examination of brain tissue. But if there were any doubt about that, I think that the phrase... I'm so sorry to interrupt you, but one of the questions I asked your friend on the other side related to, hey, what's the standard? Are we using a least sophisticated consumer? Because I understand that everything you say would make sense to the judges involved, to the lawyers involved, but if we drop that standard to a least sophisticated consumer or a ambiguity resolved against the draft or sort of thing, then maybe that ambiguity in postmortem has a little more traction. What do you say? So I would say two things. First, that as I think your colloquy with my friend illustrated, I think the phrase by a board-certified neuropathologist eliminates any doubt. Let me bracket that. That's my other textual argument. I'll come back to that. Let me go directly to the question of the standard, which you asked about and Judge Chung, you asked about as well. I simply don't think that there is any support for a canon of construction that says that if you can identify any after-the-fact ambiguity, that somehow gets construed in favor of a party who is a potential plaintiff to the class action. If you take a look at each of the cases on which my friend relies in his brief, they all just stand for the ordinary proposition that a notice has to contain sufficient information for a class member to make an informed determination. The contra profferentum canon does not apply here, both because there was a provision in the agreement that foreswore it, but also because when you're talking about a settlement agreement like this, this is not a settlement agreement that was drafted by the NFL. It was a result of a negotiation, and of course, it was approved by Judge Brody. At the end of the day, I think you have to figure out what the most natural reading of the terms in the agreement is. And I think even if you put a thumb on the scale here, ultimately, there is no ambiguity. And again, I would come back to the phrase by a neuropathologist. If you thought that post-mortem standing alone was susceptible to ambiguity, the fact that this diagnosis had to be made by a board-certified neuropathologist presupposes that the neuropathologist is exercising his or her specialized neuropathological skills in making that diagnosis. And the choice of that... But all of the work is being done by neuropathologists, by the word neuropathologist. I think we would have comfortably the better of the arguments, even if that were not in there. And I think Judge Brody appropriately relied on both, in her opinion, at pages 10 to 12 of the appendix, in concluding that our interpretation was the correct one. But I think that the choice of that phrase, Judge Chung, was no accident here. This diagnosis is different from the other diagnoses of neurological conditions in the settlement agreement, in that those diagnoses can be made by neurologists, neurosurgeons, or other neurospecialists. Can I ask you, at the time of opt-out, so before amendment, and after amendment, there's a provision that allows for advances in diagnostics, and every 10 years to adjust that. So before amendment, there was no date of diagnosis. At that time, would it have left room for a future advancement where such a brain examination was not needed? So there is a disagreement between the parties, which my friend, Mr. Campbell, alluded to on the correct way to think about the timeliness issue here. Our position is that the preliminary agreement did contain a timing requirement. It was a stricter timing requirement. It was that the death and diagnosis take place by the preliminary approval date. And precisely because that was arguably inequitable to individuals who died during the approval process, it was then modified. I guess the reason that's not entirely clear to me is in the amendment, it specifically says diagnosis by date, where it's pretty open-ended. Well, I think that that language, and it's language at the end of Section 6.3F, is specifically designed to provide additional time after the date of death for the diagnosis to take place, which the earlier version did not. And so again, we think that that redounds to the benefit of a plaintiff. But what I would say more fundamentally in response to your question, Judge Chung, is that one feature of the settlement agreement that both the District Court Judge Brody and this Court noted in approving the settlement initially is that the settlement agreement does contain this provision for, as this Court put it, keeping pace with science, and that the parties have this meet-and-confer requirement to discuss possible modifications to a qualifying diagnosis. And I think that both courts relied on that precisely in order to sort of recognize that if the science changed, the way in which the qualifying diagnoses are worded could change as well. Now, that has not happened, and I would submit that the reason that that has not happened with regard to death with CTE is that the science now is essentially the same as the science was 10 years ago. And again, to the extent that we rely on the various statements that were made at the time, we rely on them only for the proposition that an examination of the sort we're discussing here, an examination of brain tissue, was understood to be the only valid way of diagnosing CTE. And I would note that the appellants here don't identify some new method that has developed. I would invite the Court to take a look at Dr. Franklin's form letter, which was submitted in all of these cases, because ultimately, all that he really concludes is that it is more likely than not that any individual who played professional football had CTE. I can see where you're going. The question is, is that even a diagnosis? It basically just identifies the person named in the letter as a part of a population that has a higher incidence of a certain condition. But you didn't challenge that as not qualifying as a diagnosis. So we were obviously defending the claims administrator and the special master's determination that this is simply not a permissible type of diagnosis. And I think that these arguments do go to that question. I mean, I think ultimately here, in light of the fact that there's really no evidence that Dr. Franklin conducted any sort of examination at all, I suppose one could theoretically make the argument that this is just a mere hypothesis. It's not even a diagnosis. The most that Dr. Franklin said is that he conducted, quote, a study of the life and football playing history of the decedents. Obviously, we don't need to go that far in order to defend Judge Brody's decision here. I think ultimately, when you take postmortem diagnosis and buy a neuropathologist together, our construction is the only permissible construction of the language. So it seems to me that your friend on the other side kind of gets two or three cracks at the apple because it bites at the apple. The first thing they can do is say, oh, the settlement works, you know, read it our way. Even if you don't read it our way, look at the short form, look at the long form, notice. And if there's ambiguities in those, we win too. So it seems that maybe I'm mischaracterizing that. Maybe you say too generously I'm mischaracterizing that. But it feels that they get a few cracks at the apple. So I'd love to hear your thoughts on the short and the long form notice. I mean, I'll just tip my hand maybe a little bit in your favor. I thought the short form's reference to the phrase a neuropathological finding was really a remarkable thing because if there was any doubt in anyone's mind, this is very clear that it has to be done through a neuropathological finding. And if we view neuropathology as not just being a medical doctor, but one that looks at cells and tissues typically under a microscope, the short form may be the clincher. The long form's not so much of a clincher, though. So I've revealed my hand. I'd like to hear your hand. I'm happy to tip mine, Judge Phipps. So I think what I would say is first that I don't think that there is any sort of independent challenge to the short form or the long form here. And that's for good reason because, of course, both the short form and the long form point would be class members to the underlying settlement agreement to the website. The settlement agreement was, of course, public. I do think that the notices perhaps mildly help our argument, in part for the reason that you alluded to, which is that there's the reference to a neuropathological finding, which I think is confirmatory of our understanding. There's also the language that talks about certain cases of CTE, which I think makes clear that you have to have, or we suggest that you have to have a diagnosis through certain particular means. But again, I think I would get back to the very cases on which Mr. Campbell relies for the broader due process principle here. As this court put it in baby products, the question here is, does the notice contain sufficient information to enable class members to make informed decisions on whether or not they should take steps to protect their rights, including opting out of the class or objecting to the settlement? And I think if you had a class member who had any question about how there should be a permissible diagnosis, the ordinary course would be to raise that as an objection or to opt out. It is not that a class member can wait and then say, well, any ambiguities here should be construed in our favor. And we're not aware of any case law, either from this court or from other circuits, that stands for that proposition. Now, I don't think the court needs to wade into... Sorry, Henry Diodrex contains some pretty broad language about when a collateral attack is appropriate, supporting certain claimants' argument that they need not be bound by the terms of the settlement agreement. And so why isn't it that even if you're correct that the district court properly interpreted the agreement, that this due process challenge, which doesn't seem to have been squarely presented in advance of final approval by these claimants, is not a tolerable claim under Henry Diodrex? So I think I would say a couple of things about that, Judge Freeman. The first is that, as I think Judge Chung's question suggested, I don't think that there was really an independent due process claim here. I think that Mr. Campbell suggested that he's really using it in support of this sort of avoidance-type argument that if there is any ambiguity, the agreement should be construed in the plaintiff's favor. Now, again, my fundamental view here is that the agreement read as a whole is unambiguous. And so the court doesn't need to tackle that question, which I think would be a question of much broader significance here. But again, I think my point about baby products, diet drugs, this court's other cases involving class actions, is simply that they talk about the importance of notice. We certainly agree with that here. But I think that that doesn't translate into a sort of canon of construction that inevitably operates in a plaintiff's favor. My understanding is that these claimants, they lost their claim before the claims administrator or the special master. They then lost initially before the district court. And in seeking reconsideration of that decision by the district court, they said, we understand the contract differently. But even if it goes how you say it is, that's a due process problem. And so is and then that they continued that argument on appeal to us. So how is that not squarely presenting the due process? I think I would characterize that as more of this sort of you should interpret this in our favor to avoid a due process problem. I was simply saying that I don't think that that is a sort of independent due process claim. But again, I view that as similar to these arguments about, you know, contraproferentum and the like. These are just, I think, canons of construction that are being invoked to put a thumb on the scales in favor. But I think ultimately, if you conclude that there is no ambiguity, there's no reason to reach that. And our fundamental submission here is that there is no ambiguity about any of the relevant terms. And I would note one further thing, Judge Freeman, about this court's earlier opinion here, because it is obviously a very comprehensive opinion addressing the settlement. It is a fair point, as Mr. Campbell says, that there was no objection specifically on this basis as to the method of diagnosing death with CTE. But as Judge Brody noted, the most commonly raised objections related to the settlement's treatment of CTE. And there were objections all around this issue concerning the scope of the benefits for CTE. And so when you look at this court's earlier opinion, and I would certainly urge the court, as I'm sure it has already done, to look at that section from page 441 to page 444, I think it really stands for three propositions. First, as we say, that CTE was only diagnosable validly through a post-mortem examination. Second, that the settlement was fair even though the science could evolve in the future. And third, again, that the settlement's diagnoses could be modified if the science evolves. And so I would submit that if we ever get to a point— But not for death with CTE. Sorry? But not for death with CTE. Well, the settlement's definition could be modified if— I think the definition of death with CTE, like the other definitions, could potentially be modified, is subject to the 10-year meet-and-confer requirement. My point is simply that it hasn't happened. But would that happen, though, if the diagnosis had to have been rendered in 2015, or 270 days after the final settlement date? Why would that clause ever come into play? Well, I think it's a fair point that if we're correct about the timeliness issue— and again, there's an ongoing debate about that— if we're correct about the timeliness issue, then I think you're correct, that this would be a null set except for claims like these that are still in the judicial process. But as far as we're aware, I believe that this is the last currently active set of claims for a death with CTE. And again, I think up to this point, the understanding has been that the diagnosis has to take place through examination of brain tissue. I believe that the league has paid out somewhere in the neighborhood of $1.3 billion on claims, including somewhere in the neighborhood of $100 million on claims for death with CTE specifically, where the claimants have come forward with the necessary evidence. Are you aware of individuals who opted out of the class because upon receipt of the notice, they perceived they were unable to satisfy the diagnostic criteria as you understand them? I'm not aware of any plaintiffs who opted out specifically on that ground, Judge Freeman. There were opt-outs more generally, but I'm not aware of any plaintiffs who have opted out on that basis and proceeded on that basis. But your position, tell me if I'm understanding this correctly, is that upon receipt of the notice, someone whose loved one, the deceased retired NFL player, had been long since deceased and did not have a brain tissue examination, would have known that they needed to opt out at that time because they would be unable to at any point obtain the required diagnosis? Well, they could have opted out. I don't think that that claim would have been likely to succeed because of the scientific reality, Judge Freeman, which was, again, that the understanding at the time as now was that the only valid basis for diagnosing death with CTE was through this sort of brain tissue examination. And so it may very well be that there are individuals whose loved ones died who did not have such an examination, and therefore cannot come forward with the scientifically requisite evidence to prove the brain pattern of tau proteins, the abnormal pattern of tau proteins that is the marker of CTE. But ultimately, the question that is before this Court is simply the question of whether or not the plain terms of the agreement require that sort of examination. And our fundamental submission is that they do, consistent with the ordinary understanding of these terms. And again, I don't think that there's any warrant for a lower standard than simply the ordinary construction of the terms. But even if the plain terms, let's say we don't agree with you, even if the plain terms don't require, per se, a brain exam, so for instance, if you look at Exhibit 1, neurocognitive impairment at level 1.5, there are really specific diagnostic criteria, both of what the symptom is and how the symptom is ascertained, which is notably missing from the death with CTE definition in Exhibit 1. So even if we were to say, as a matter of contract interpretation, the word neuropathologist doesn't do as much work as you say, is it, as a practical matter, given that the record from what I've seen, and if there are any other references, I'd be happy to hear them, but the record reflects there have been no such advances, to your point. So as a practical matter, the only way, even if the settlement agreement, by its plain terms, does not require a brain exam, as a practical matter, one is required. I certainly think that as a factual matter, a document like this would be insufficient. And while there is obviously a sort of great deal of specificity with regard to qualifying diagnoses for, say, neurocognitive impairments while still alive, I would note that CTE itself is understood very specifically as a particular pattern of tau proteins on the brain, which is to say that CTE, by definition, is a condition that exists in the brain. It is diagnosable only after death, as matters currently stand, for the simple reason the brain tissue cannot be evaluated while still alive. There is a lot of uncertainty about what symptoms correlate with CTE and so forth. And so I think all of this leads to the same conclusion, which is that as a practical matter, it is both insufficient under the settlement agreement and insufficient as a factual matter, simply to say as a blanket matter, it is more likely than not that former NFL players had a CTE. And I would note that the problem with a conclusion like that is that it inevitably results from selection bias by virtue of the fact that not every former NFL player has been subject to one of these brain examinations. Thank you.  Thank you. May I proceed, Your Honor? Thank you. Yes, we're good for your five minutes, yeah, yes. I'd like to touch on four points. Let me start, I think, with where my friend began and where one of your questions led him, Judge Freeman, which was putting yourself in the position of someone whose NFL player, family member, had died. When they received notices about this settlement, what would they have been thinking, what would be going through their mind? In this case, with a family member either buried or cremated, if it had been made clear to them that they would have had to have an examination of brain tissue, you would have seen a mass exodus of family members of NFL players who had died. Because if a family member had been cremated and they knew that they needed an examination of brain tissue, there's no reason to stay in the settlement. If they knew that they had to exhume their loved one to get their brain tissue, that's obviously a large disincentive for anyone who has philosophical or religious objections to that. And yet, in this case, no one has pointed to any evidence that there was a mass exodus, and I think that points to the fact that the notice did not notify those individuals that that would be required. But I think Mr. Sandringham stated, and you may have agreed to that, that the due process argument here was really just raised as a backup to your claim about how the contract should be construed. And if you agree with that, then is he correct that this is not a proper collateral attack on the settlement agreement? So I'm glad you asked about that. That was my second point, Judge Freeman. If you look at the record, I think it's at 2273, you'll find that this case actually goes back a little further than your colloquy with Mr. Chamagian indicated. Ms. Sagapulitelli originally filed a separate lawsuit, and in response to correspondence from the NFL, was told, you can't file this lawsuit, you're part of the class, therefore any challenge has to be brought in the context of that. That lawsuit was dismissed without prejudice, and the first thing that Ms. Sagapulitelli filed in the court was a Rule 60 motion, attacking the settlement agreement and the final judgment. At that point on the timing issue, a due process argument regarding the timing issue. At that point, there was no challenge to the brain tissue examination requirement, because we didn't think that one existed. That didn't arise until Judge Brody denied that motion without prejudice, and directed us to go through the claims process, reasoning, I think, that if we went through the claims process and the claim was paid, there was no reason to have to resolve what I admit would be a weighty Rule 60 issue. And so it was only when we first got the claims administrator denial, that for the first time someone said, you can't recover because of a brain tissue issue. That brings me to my third point, which is, I would invite the court to look at the language in that denial. Because one of the things that stuck out to me in Mr. Chamagian's first minutes, was his reference explaining what post-mortem diagnosis means. Because throughout the briefing, and in his time before the court today, anytime there was an explanation about post-mortem diagnosis, it devolved into other terms like post-mortem examination. If you look in the record, I think it's around 2455, in the objections that we filed with Judge Brody, we quoted the paragraph from the claims administrator, from the denial. And what you will notice there, is that the claims administrator in denying the claim, said, criticize Dr. Hamilton, who was the neuropathologist in this case, criticize Dr. Hamilton for not confirming his diagnosis with a post-mortem examination. Now again, that sounds completely different than asking for a post-mortem diagnosis. So I would encourage the court to read that language, because I think it shows, again, how the terms used in the settlement are different than the terms that you're hearing argued in the briefs. But as a matter of reality, can you get a post-mortem death with CTE diagnosis without a brain exam? Yes. Just as a matter of reality. So Judge Chung, it is definitely our position that yes, you can. And I know that my friend. Where is that in the record? So, let me say, two places. One, let me point you outside the record. I think it's not going out of bounds, and I point you to the argument in the 2016, I think the argument might have actually been 2015, but the argument by Mr. Clement and others before this court determining whether to approve the settlement agreement. You will hear that even in the arguments there, there were individuals saying, we believe that CTE can be diagnosed without, well, there it wasn't about a brain tissue examination, because the issue was different. It was about treating people who are living with CTE differently than those who died. And so there were some individuals advocating for a different diagnostic criteria structure that would allow them to diagnose, because they didn't believe that brain tissue was required. The second thing, and see my time's up, but if I may finish answering, Your Honor. The second thing I would say is, if the NFL had wanted to fight over Dr. Hamilton's diagnosis, then we could have had different language in the settlement agreement. But the settlement agreement, as settlement agreements always do, gave up procedural protections and headaches that we would have if this case was litigated. And so in lieu of having a battle of the experts over what constitutes a diagnosis, instead the settlement agreement provided a simple who, what, and when. When, post-mortem. What, diagnosis of CTE. Who, by a board-certified neuropathologist. And as you mentioned, there were not diagnostic criteria, there was no review. The settlement agreement simply said, if you can find a board-certified neuropathologist who can review your case and give you a diagnosis, that entitles you to settlement funds. That plain language from the settlement agreement is what my clients relied on, and it's what we'd ask this court to find, and for that reason to reverse. Very briefly, Ms. Asaga Polizelli, her 2017 Rule 60B motion that you said was, she was directed to go through the claims process. Would she be able to revive that if her claim, if we were to affirm the denial of her claim? Yes, it's our position that we would, because at this point, what we believe is really before the court is the claim denial. And so if this court affirmed that claim denial, then we would have to go back and look again at the Rule 60 motion that would be re-ersed before Judge Brody. Thank you very much. Thank you, Your Honors. I guess we'll take the matter under advisement. We will.